## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **JAMIE MARIE BLACKBURN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 C 5198** |
| **v.** | ) | |
| | ) | **Magistrate Judge Nan R. Nolan** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jamie Marie Blackburn filed this action seeking review of the final de-cision of the Commissioner of Social Security ("Commissioner") denying her applica-tion for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("SSA"). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a motion for summary judgment. For the reasons stated below, this case is remanded for fur-ther proceedings consistent with this opinion.

## I. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits ("DIB") or Supplemental Security In-come ("SSI") under Titles II and XVI of the SSA,[1] a claimant must establish that he

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

or she is disabled within the meaning of the SSA. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001); *Keener v. Astrue*, 2008 WL 687132, at *1 (S.D. Ill. 2008). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on March 16, 2006, alleging she became disabled on August 26, 2005, due to right knee injury and depression. (R. at 11, 22–24, 38, 49, 61, 73–77, 337–39.) The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 11, 22–24, 31, 34–38, 45–49, 325–36.)

On September 30, 2008, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge ("ALJ"). (R. at 11, 344–77.) The ALJ also heard testimony from Edward A. Pagella, a vocational expert ("VE"). (*Id.*)

The ALJ denied Plaintiff's request for benefits on November 5, 2008. (R. at 11–19.) Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since August 26, 2005, her alleged onset date. (*Id.* at 13.) At step two, the ALJ found that Plaintiff's degenerative joint disease and affective disorder are severe impairments. (*Id.*) At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 14.)

The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[2] and determined that Plaintiff has the RFC to perform a full range of sedentary work but can only perform occasional postural maneuvers. (R. at 14.) Based on Plaintiff's

---

[2] "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

RFC and the VE's testimony, the ALJ determined at step four that Plaintiff could not perform any past relevant work. (*Id.* at 18.) At step five, based on Plaintiff's RFC, her vocational factors and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the regional economy that Plaintiff can perform, including work as a hand sorter, bench assembler, or hand packer. (*Id.*) Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.* at 18–19.)

The Appeals Council denied Plaintiff's request for review on September 24, 2009. (R. at 4A–4C). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more

than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th *Id.* 2002).

## IV. DISCUSSION

### A. Medical Evidence

In April 2003, Plaintiff climbed on a stool in her kitchen to change the time on a clock. (R. at 179.) The stool gave way, and Plaintiff crashed to the floor. (*Id.*) The fall seriously injured her right knee, tearing her anterior cruciate ligament (ACL), as well as her lateral meniscus and her medial meniscus, which are pieces of cartilage that spread the load of the body's weight and reduce the amount of friction generated when the joint is moved. (*Id.*)

About two months later, Steven A. Marciniak, M.D., an orthopedic surgeon, performed an operation on Plaintiff's right knee. (R. at 199–201.) Dr. Marciniak removed some of the cartilage from Plaintiff's lateral meniscus and medial meniscus in a procedure known as a meniscectomy; he also used an arthroscopic shaver to debride the "stump" of her ACL that remained attached to her femur. (*Id.*)

This was not the first time Plaintiff had suffered an injury to her right knee, or the first time it had been operated on. About fifteen years earlier, when she was in high school, a fellow student shoved a desk into her knee, apparently as a prank. (R. at 357.) The impact tore some cartilage in her knee, and she had to have surgery to repair the damage. (*Id.*)

Plaintiff's right knee continued to cause her problems even following Dr. Marciniak's surgery. While Dr. Marciniak noted that she walked with a normal, reciprocal gait, he also observed that Plaintiff "seems like she is having significant discomfort." (R. at 177.) Indeed, Plaintiff complained that physical therapy was not helping her recovery, describing a persistent, aching pain in her knee. (*Id.*) Dr. Marciniak suggested that she wear a brace, but it did not help; Plaintiff's knee buckled even when she was wearing the brace, and she continued to experience significant pain. (*Id.* at 175–76.)

By December 2003, Dr. Marciniak concluded that Plaintiff would need another surgery to reconstruct her ACL. (R. at 175.) More than a year passed before that surgery was scheduled, however, because Plaintiff's husband passed away unexpectedly and she did not have insurance to cover the surgery. (*Id.* at 174–75.) The

operation finally took place in February 2005. Dr. Marciniak used tissue from a ca-
daver to reconstruct Plaintiff's ACL in a procedure known as an allograft. (*Id.* at
196–98.) Two months later, Plaintiff said she was feeling "great" and that "this is
the best her knee has felt in two years." (*Id.* at 173.) She was doing so well by June,
in fact, that Dr. Marciniak told her that she could "do anything except jumping,
sprinting, and cutting" and that he would remove all work restrictions by August.
(*Id.*)

But a few weeks later, Plaintiff injured her knee again. (R. at 172.) While swim-
ming in a wave pool, she was "hit from behind" by one of the artificially generated
waves. (*Id.*) Dr. Marciniak suspected that she may have torn the graft that he used
to reconstruct her ACL. (*Id.*) Indeed, an MRI confirmed an "ACL graft failure" and
also showed a tear in Plaintiff's posterior cruciate ligament. (*Id.*) Dr. Marciniak rec-
ommended another surgery to reconstruct Plaintiff's ACL. (*Id.*) He also prescribed
Mobic and Vicodin for her pain. (*Id.*)

Up until this point, Plaintiff had been working at Wal-Mart as a clerk. She
manned the registers and also stocked the store. (R. at 82.) Her duties required her
to lift up to 50 pounds on a frequent basis. (*Id.*) Immediately after she injured her
knee in the pool, however, Dr. Marciniak restricted her to light work. (*Id.* at 172.)
Because Wal-Mart did not have any available jobs that required only light work, the
store placed her on disability leave. (*Id.* at 350.)

The second ACL-reconstruction surgery took place in October 2005. (R. at 171.)
Plaintiff's recovery did not go as expected. In April 2006, she told Dr. Marciniak

that she felt constant pain in her right knee, even when she was resting. (*Id.* at 169.) She continued to rely on Vicodin to provide relief. (*Id.*) Dr. Marciniak observed that she walked with an antalgic gait: "a limp adopted so as to avoid pain on weight-bearing structures, characterized by a very short stance phase." (*Id.*) "Things just are not getting better," Dr. Marciniak lamented in May 2006. (*Id.* at 168.) By that point, he had concluded that Plaintiff needed another surgery, this time to replace her knee entirely. (*Id.* at 168, 356.)

During this time, Plaintiff made a brief and unsuccessful attempt to return to work. In February 2006, Plaintiff left her job at Wal-Mart, where she was on disability leave, and started a new job at Seattle Sutton's Healthy Eating. She was hired to work on the assembly line packaging prepared meals, which required her to stand for most of the day. (R. at 83.) But she did not last even 30 days at this new job; the pain in her knee from standing up all day was too much to bear. (*Id.* at 351.)

Because Plaintiff did not have insurance, she could not afford to get the surgery Dr. Marciniak said she needed. (R. at 298.) Instead, she acquired a cane to help her get around and continued to take medication to stave off the pain. (*Id.* at 298, 324.) By January 2007, Aftab A. Khan, M.D, an internist, prescribed Methadone for her pain. (*Id.*) However, Dr. Marciniak "explained to her that I really want her to try to get off the narcotics if at all possible as this really adds insult to injury needing more and more narcotic and her body perceiving more and more pain when her receptors are not filled." (*Id.*) Dr. Khan also expressed concern that Plaintiff might need to be weaned off the medications after she finally got the knee surgery she

needed. (*Id.* at 297.) Dr. Marciniak tried to alleviate Plaintiff's pain by injecting the anesthetic Marcaine and the anti-inflammatory steroid Celestone directly into her knee, although this "really did not help things much." (*Id.*) In March 2008, to make matters worse, she slipped on some ice and "banged her knee." (*Id.* at 296.)

Plaintiff testified that she cannot sit down for extended periods of time because her hips and her back give her so much pain, which she rated as 10 on a 10-point scale. (R. at 355, 360.) She needs to keep her knee elevated and bent in "a certain way" because any other positions are extremely uncomfortable: "I can't sit like a normal person. I can't let my leg hang down or anything. I usually have it . . . propped up a little bit . . . ." (*Id.* at 361.) But this requirement left her with little opportunity to move about. "I keep ice on my knee on and off throughout the day," she stated, "and just lay around and mostly sleep." (*Id.* at 353.) She uses a cane to get around, but she is not able to walk around for long periods of time. (*Id.* at 358.) When she goes to a grocery store, for example, she has to use a wheelchair. (*Id.*) It took "all I can do" to walk about 40 feet from the reception area to the hearing room, she told the ALJ. (*Id.* at 363–64.) Sometimes she would "try to help a little bit with the laundry and everything, but then my back and my hips and my knees start hurting and I can't do any more." (*Id.* at 353.) Nor was she able to drive because she takes Methadone for her pain and, as a result, suffers from side effects like sleepiness and loss of concentration. (*Id.* at 358.)

## B. Analysis

The ALJ determined that Plaintiff is not disabled because she is capable of per-forming a full range of sedentary work. (R. at 14–17.) This conclusion was but-tressed by two significant findings. First, the ALJ asserted that Plaintiff does not have an impairment that meets or medically equals Listing 1.02, major dysfunction of a joint due to any cause, because she "retains effective ambulation and is capable of performing sedentary work." (*Id.* at 14.) Second, the ALJ reasoned that Plaintiff was not fully credible when she testified about her functional limitations. In par-ticular, the ALJ asserted that there is no evidence that Plaintiff actually has to ele-vate her knee, as she testified she needs to do, and her cane and knee brace did not "necessarily" mean she could not perform sedentary work. (*Id.* at 17.) The ALJ also cast doubt on Plaintiff's reports of pain by pointing out that her doctors had dis-cussed weaning her off of pain medications. (*Id.* at 16.)

### 1. Credibility

Plaintiff contends that the ALJ erred in discounting her testimony about the na-ture and extent of her ailments. (Mot. 12–14.) In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omit-ted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling ("SSR")[3] 96-7p. An ALJ may

---

[3] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration."

not discredit a claimant's testimony about her symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). If a claimant's symptoms are not supported by medical evidence, the ALJ may not ignore available evidence. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without

---

*Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

In her decision, the ALJ made the following credibility determination:

> After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 15.) This analysis is mere boilerplate that "yields no clue to what weight the trier of fact gave [Plaintiff's] testimony." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (reviewing similar language and finding that "[i]t is not only boilerplate; it is meaningless boilerplate[; t]he statement by a trier of fact that a witness's testimony is 'not *entirely* credible' yields no clue to what weight the trier of fact gave the testimony"); *see Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787–88 (7th Cir. 2003) ("This is precisely the kind of conclusory determination SSR 96-7p prohibits. Indeed, the apparently post-hoc statement turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the Brindisis' credibility as an initial matter in order to come to a decision on the merits."). The ALJ does not explain which of Plaintiff's allegations were credible, which were incredible, or provide reasoning in support of her findings. *See Groneman v. Barnhart*, 2007 WL 781750, at *11 (N.D. Ill. March 9, 2007) ("The ALJ may have provided a *reason* for rejecting [claimant's] allegations—because he did not seek treatment and follow through with medication—but he did not provide *reasoning*."). The ALJ's de-

cision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2.

Under the circumstances, none of the reasons provided by the ALJ for rejecting Plaintiff's credibility are legally sufficient or supported by substantial evidence. First, the ALJ erred in asserting that, because both Dr. Marciniak and Dr. Khan suggested that Plaintiff wean herself off her pain medication, her "actual need for such medication is in question." (R. at 16.) The ALJ's point, presumably, is that Plaintiff is not suffering from real pain but may, in fact, be addicted to her medications. However, this conclusion is not supported by the medical record. To the contrary, both Dr. Marciniak and Dr. Khan believed that Plaintiff was experiencing real, debilitating pain as a result of the injury she suffered to her right knee and, accordingly, needed pain medication to relieve her suffering. (*Id.* at 296–98, 324.) Their warnings about her continued use of what the ALJ termed "strong pain medication" does not demonstrate that they thought she was exaggerating her pain or the extent of her knee injury but instead reflects their concern about potentially serious side effects from the medications. Further, there is no evidence that Plaintiff was engaged in drug-seeking behavior because she was addicted to the painkillers. Plaintiff did not "obtain[], or attempt[] to obtain, pain medication by deceiving or manipulating a medical professional." *Kellems v. Astrue*, 382 F. App'x 512, 515 (7th Cir. 2010); *cf. Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) ("Multiple physi-

cians throughout the course of his treatment noted that [claimant] was overusing his pain medication and that such overuse might actually be causing some of his symptoms . . . ."); *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009) (finding "sufficient evidence in the record to support the ALJ's determination that [claimant's] credibility about her pain and limitations was compromised by her drug-seeking behavior"); *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003) ("[T]he record supports the ALJ's finding concerning Anderson's possible overuse of narcotic pain medications."). The ALJ's refusal to believe Plaintiff's account of the pain she was experiencing is not justified by the specific reasons the ALJ gave and, in fact, is contradicted by the evidence in the record.

Second, the ALJ erred in concluding that Plaintiff's brief employment at Seattle Sutton's in February 2006 casts doubt on her testimony that her knee causes her great pain. (R. at 16–17.) On the contrary, a claimant's "unsuccessful attempts to pursue various vocations might just as easily provide corroboration that her impairments significantly limited her ability to work, as opposed to evidence that her ability was greater than she alleged." *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011); *see also Kangail v. Barnhart*, 454 F.3d 627, 629–30 (7th Cir. 2006) (explaining that a claimant who can hold a job only for a short period of time because of her impairment is not capable of substantial gainful activity). The ALJ did not consider the possibility that Plaintiff's ill-fated employment experience at Seattle Sutton's *supports* rather than *undermines* her testimony about the limitations wrought by her knee injury. In fact, there is no evidence in the record to contradict

Plaintiff's statement that she made a good-faith effort to return to work as an assembler but had to quit abruptly when it turned out that she could not perform her duties without incurring unbearable pain.

Finally, the ALJ erred in concluding that there is no evidence to support Plaintiff's testimony that she has to elevate her knee. (R. at 17.) The ALJ stated that a state-agency doctor who examined Plaintiff did not make any mention of this limitation and, in fact, found that she was capable of performing light work with only a few postural limitations. (*Id.*) What the ALJ failed to take into account, however, is that Plaintiff's condition worsened during the two years between June 2006, when the state-agency doctor performed his evaluation (*id.* at 209–16), and September 2008, when she appeared at the hearing (*id.* at 344). Indeed it was only a month before the state-agency doctor's evaluation that Dr. Marciniak determined that the fourth surgery had been unsuccessful and that Plaintiff needed a total knee replacement procedure. (*Id.* at 168, 356). Dr. Marciniak's notes from 2007 and 2008 demonstrate that, because Plaintiff could not afford the surgery, her condition was deteriorating. (*Id.* at 296–300). For example, in September 2007, he noted that Plaintiff's "knee is giving out on her more. The brace does not help her as much as it used to and she is having pretty much constant pain." (*Id.* at 297.) And in March 2007, Dr. Marciniak observed "medial degenerative change" in Plaintiff's knee. (*Id.* at 299.)

The ALJ erred in relying on the opinions of the nontreating, nonexamining state agency physician over the opinions of Plaintiff's treating physician. A "contradictory

opinion of a non-examining physician does not, by itself, suffice" to provide the evidence necessary to reject a treating physician's opinion. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *Oakes v. Astrue*, 258 F. App'x 38, 44 (7th Cir. 2007); *Holmes v. Astrue*, 2008 WL 5111064, at *7 (W.D. Wis. 2008) ("A contradictory opinion of a non-examining physician is not sufficient by itself to provide the evidence necessary to reject a treating physician's opinion."). Because the ALJ did not grapple with the parts of the record discussing Plaintiff's worsening condition, her credibility determination is not supported by substantial evidence. For all these reasons, the credibility determination must be overturned.

### 2. Listings 1.02 and 1.03

Plaintiff also contends that the ALJ did not sufficiently analyze whether her impairments meet or medically equal either Listing 1.02 or Listing 1.03. (Mot. 8–11.) At step three, a claimant is presumptively disabled if he or she has an impairment that meets or equals one of a list of specific impairments enumerated in the Listings of Impairments. *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999); *see* 20 C.F.R. §§ 404.1520(d), 416.920(d), pt. 404, subpt. P, app. 1. "The Listing describes impairments that are considered presumptively disabling when a claimant's impairments meet the specific criteria described in the Listing." *Maggard*, 167 F.3d at 379–80; *see* 20 C.F.R. §§ 404.1525(a), 416.925(a).

"A claimant may also demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing." *Barnett v. Barnhart*, 381 F.3d 664, 664 (7th Cir. 2004);

*see* 20 C.F.R. §§ 404.1526(a), 416.926(a). "Thus, an impairment is equivalent to a listed impairment 'if it is at least equal in severity and duration to the criteria of any listed impairment.'" Frank S. Bloch, *Bloch on Social Security* § 3.26 (May 2011) (quoting 20 C.F.R. §§ 404.1526(a), 416.926(a)). Medical equivalence may be found in one of three ways: (1) the claimant's impairment is included in the listings but one or more of the criteria set out in the listing for that impairment cannot be met; (2) the claimant's impairment is not included in the listings, but another listed impairment can be used as a guide; or (3) the claimant has a number of impairments that do not meet or equal a listed impairment, but can be combined together to meet an analogous impairment in the listings. *See* 20 C.F.R. §§ 404.1526(b); 416.926(e); *Bloch on Social Security* § 3.26. In determining whether a claimant's impairment is medically equivalent to a listed impairment, the SSA will consider all relevant evidence. 20 C.F.R. §§ 404.1526(c), 416.926(c) ("When we determine if your impairment medically equals a listing, we consider all evidence in your case record about your impairment(s) and its effects on you that is relevant to this finding."). The ALJ's analysis of this issue must be supported by substantial evidence and therefore, at the very least, the ALJ's opinion must include a robust discussion that demonstrates how the ALJ arrived at her conclusion and permits a meaningful evaluation of the ALJ's analysis by a reviewing court. *Moss*, 555 F.3d at 562 (ALJ's listing analysis must be supported by substantial evidence); *Steele*, 290 F.3d at 940 (same).

To meet either Listing 1.02 or Listing 1.03, a claimant's impairment must, among other things, prevent her from "ambulating effectively." This term of art is further defined as

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. pt 404, subpt. P, app. 1 § 1.00B2b(1). The definition is fleshed out with the following examples:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* pt 404, subpt. P, app. 1 § 1.00B2b(2).

Here, all the ALJ said in her analysis was that Plaintiff did not meeting Listing 1.02 because she "retains effective ambulation." (R. at 14.) The ALJ's two-sentence analysis is insufficient in light of the complex definition of "ineffective ambulation" and the evidence in the record, including Plaintiff's testimony, that suggests her impairments may meet this standard. As the Seventh Circuit pointed out in *Moss*, although the regulations define "ineffective ambulation" *generally* to encompass a

claimant whose lower-extremity injury is so severe that she must use an assistive device that limits the functioning of *both* her hands, a standard that Plaintiff clearly does not meet, "the regulations further provide a nonexhaustive list of examples of ineffective ambulation" that do *not* require the claimant to depend upon that sort of assistive device. 555 F.3d at 562. But the ALJ did not take any of these examples into account. Nor did the ALJ analyze whether Plaintiff's knee brace created an extreme limitation of the ability to walk. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) ("What is troubling is that the ALJ, in addition to not mentioning Listing 1.04A, did not evaluate any of the evidence on its required criteria that is favorable to Ribaudo."). Given Plaintiff's testimony that she does have problems ambulating effectively within the meaning of the regulations, and given this Court's conclusion that the ALJ's credibility determination was faulty, the Commissioner will need to take a fresh look at this question on remand.

Further, at the hearing and in a pre-hearing memorandum, Plaintiff requested the ALJ to consider Listing 1.03. (R. at 142–43, 366.) However, in her decision, the ALJ did not even mention Listing 1.03, much less explain in any detail why she thought that Plaintiff was able to ambulate effectively under the definition laid out in Listing 1.00B2b. The ALJ did not acknowledge Plaintiff's argument, did not obtain medical opinion on the issue of medical equivalence and did not analyze whether the evidence supported a finding that Plaintiff's impairments equaled Listing 1.03. The ALJ's failure to discuss Listing 1.03 constitutes legal error. *See Barnett*, 381 F.3d at 664 ("In considering whether a claimant's condition meets or

equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing."). Further, by not acknowledging Plaintiff's argument, it is unclear whether the ALJ even considered Plaintiff's claim. *See Brindisi*, 315 F.3d at 786 (ALJ's conclusion that "none of these impairments meet the requirements of an impairment listed in Appendix 1 to subpart P of regulation no. 4 . . . [is] devoid of any analysis that would enable meaningful judicial review"); *Barger v. Astrue*, 2009 WL 807587, at \*5 (S.D. Ind. March 25, 2009) (concluding "that when an ALJ is specifically asked to consider a listing by number both in the oral argument portion of the hearing and in the posttrial brief, the failure to specifically address that listing does require remand where the Court cannot trace the path of reasoning").

## C. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate Plaintiff's mental and physical impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings. The ALJ shall explicitly and thoroughly consider whether Plaintiff's impairments meet Listing 1.02 or Listing 1.03.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 18] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: January 3, 2012

_____
NAN R. NOLAN
United States Magistrate Judge